# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RAJENDRA P. MULLAPUDI, M.D., ) | |
| ) | |
| Plaintiff, ) | No. 07 C 2053 |
| ) | |
| v. ) | Judge John W. Darrah |
| ) | |
| MERCY HOSPITAL AND MEDICAL ) | |
| CENTER and STEVENS R. POTTS, D.O., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rajendra P. Mullapudi, M.D., filed a twelve-count Amended Complaint against the Defendants, Mercy Hospital and Medical Center ("Mercy") and Steven R. Potts, D.O. ("Dr. Potts") (collectively, "the Defendants"), alleging race and national origin discrimination (Counts I – III), breach of contract (Counts IV and V), intentional infliction of emotional distress (Counts VI and VII), defamation (Counts VIII and IX), false light invasion of privacy (Counts X and XI), and intentional interference with contractual relationship (Count XII). The Defendants seek to dismiss the state-law claims – Counts IV-XII – pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## BACKGROUND

A reading of Plaintiff's Amended Complaint supports the following summary of the alleged operative conduct of the parties.

Plaintiff was a former resident physician at Mercy. Mercy is a chartered hospital with its principal place of business located at 2525 S. Michigan Ave., Chicago, Illinois. Dr. Potts is employed as the Program Director of Internal Medicine at Mercy.

In January 2005, after completing three months of his third-year residency ("PGY3")[1], Plaintiff traveled to Hyderabad, India, for his brother's wedding. Plaintiff used his vacation time to account for his absence at Mercy. Plaintiff's January 10, 2005 flight from Hyderabad to Bombay, India, was delayed for three hours, which caused Plaintiff to miss his connecting flight home to the United States. There was no available seat scheduled to leave Bombay until four days later, on January 14, 2005. Plaintiff emailed his chief resident at Mercy to inform them of this delay, pursuant to his contract. The chief resident emailed Plaintiff, accusing him of returning late from a previous vacation from India and demanding that he return to the United States immediately. The email further stated that Plaintiff had been able to leave four days early to accommodate this trip. Contrary to the email, Plaintiff had not taken a previous trip to India during his residency at Mercy and had been given permission for only one day of early leave to begin this trip.

On January 17, 2005, Plaintiff met with Dr. Potts to explain the circumstances surrounding his late return. On January 19, 2005, Dr. Potts sent Plaintiff a letter, informing him that he was being terminated because of his inability to perform assigned duties and his unsatisfactory performance in professionalism by "not displaying responsible behavior" in light of his failure to return from vacation in an abandonment of his patient-care responsibilities. Dr. Potts questioned Plaintiff's explanation for the delay in Plaintiff's return back from India. The letter also referenced Plaintiff's previous academic difficulties. Besides temporary delays in

---

[1] "PGY" is an acronym for "Post-Graduate Year." PGY2-1 will refer to Plaintiff's first completion of the second-year residency program at Mercy. PGY2-2 will refer to Plaintiff's second rotation as a second-year resident in the program.

2

completing dictations of records and the short postponement of his resident talk during his second-year residency, Plaintiff was unaware of any alleged problems with his performance. The overwhelming majority of Plaintiff's evaluations during his first two years and three months of his residency at Mercy rated him positively and often "superior" in category of professionalism.

Dr. Potts' letter failed to mention any right of appeal with regard to the termination or any reference to any handbook or procedures, outlining such a right of appeal.

On March 21, 2005, Plaintiff sent Dr. Potts a letter, seeking his reinstatement. On April 7, 2005, in response, Dr. Warren Furey, the Chairman of the Department of Internal Medicine, wrote Plaintiff a letter, explaining that the termination was justified and informing Plaintiff that Mercy's Resident Physician Handbook ("the Handbook") required that a letter requesting a rehearing be sent within two weeks of dismissal. However, until Plaintiff received Dr. Furey's letter, he alleges that he was unaware of his due process rights and had not received a copy of the Handbook.

On April 12, 2005, Plaintiff wrote a letter, requesting a due process hearing and outlining his reasons why his dismissal was unwarranted. Mercy's Department of Internal Medicine Review Board ("Review Board") agreed to conduct an informal hearing on May 9, 2005. Following the hearing, the Review Board agreed to reinstate Plaintiff in the residency program, subject to conditions, which were not required of other residents. One of the conditions required Plaintiff to repeat PGY2, for which he had previously received credit. Plaintiff believed that the

3

terms of the reinstatement were unfair and, on June 1, 2005, wrote a letter to the Vice-President of Medical Education, appealing the decision. The position of Vice-President had been vacant for two years; and the letter of appeal was directed to Sister Sheila Lyne, the President/Chief Executive Officer of Mercy. Sister Sheila did not respond for three weeks.

On June 13, 2005, before hearing from Sister Sheila, Plaintiff agreed to comply with the conditions for his reinstatement and entered into a contract to complete PGY2 again. Dr. Potts and Sister Sheila signed Plaintiff's PGY2 contract. On June 23, 2005, Sister Sheila responded to Plaintiff's appeal and affirmed the decision of the Review Board. The PGY2 contract provided that Mercy would notify Plaintiff before January 1, 2006, whether it intended to renew the contract. Mercy did not notify Plaintiff of renewal of his contract until March 2006.

Beginning in July 2005, Dr. Potts harassed and subjected Plaintiff to unequal treatment. Dr. Potts purportedly did not follow customary teaching practice with Plaintiff during the required patient continuity clinic. Dr. Potts ignored Plaintiff and would conduct an independent examination of a patient instead of allowing Plaintiff to present the recommended course of treatment. On August 5, 2005, Dr. Potts denied Plaintiff the opportunity to "moonlight" in order to earn extra money by completing histories and physicals of already-admitted patients and/or completing dictation of medical charts for the records office. Plaintiff was the only resident not given permission to "moonlight."

On September 26, 2005, Plaintiff called in sick and missed a day of work. Upon returning to work, Plaintiff was summoned to Dr. Potts' office; and, in the presence of Dr. McDonnell, Dr. Potts proceeded to verbally humiliate and degrade Plaintiff. Dr. Potts accused Plaintiff of not complying with some of the terms of his reinstatement.

4

In October 2005, the Graduate Medical Education Coordinator notified Plaintiff that his temporary medical license was set to expire. Plaintiff wrote to the Illinois Department of Financial and Professional Regulation ("IDFPR") to explain his situation and request an extension of his temporary license. On October 26, 2005, IDFPR notified Plaintiff that he and Dr. Potts were set to appear before the Illinois Licensing Board on November 9, 2005, to provide testimony relative to Plaintiff's application for extension. Plaintiff contacted Dr. Potts' secretary before November 9 to request a meeting with Dr. Potts to discuss the upcoming meeting and to attend it together. Dr. Potts' secretary responded that Dr. Potts did not wish to meet with Plaintiff and was not sure if he was even going to attend. Dr. Potts appeared at the meeting but launched into a personal attack on Plaintiff, although Dr. Potts acknowledged that Plaintiff's clinical ability and conduct "was fine." Plaintiff's license was extended to November 2006.

In February 2006, Plaintiff's "call room" was broken into; and his car keys, among other things, were stolen. Fearing that his car would be stolen, the next day Plaintiff spoke with the head of security at Mercy, who instructed him to park his car in the Attending Physicians' lot because it had better security. Sometime later, the chief resident paged Plaintiff and instructed him that Dr. Potts wanted him to move his car from that lot.

On April 7, 2006, Plaintiff was scheduled to give his resident talk. On April 3, 2006, Plaintiff presented the resident talk to his chief resident, Dr. Douglas Tran. Plaintiff's talk was rescheduled to April 12. On April 11, Dr. Tran called Plaintiff to confirm that he was ready to give his talk the next day but did not mention that Plaintiff would have to perform his talk for more chief residents before the final presentation. On April 12 at 9:30 a.m., Plaintiff received a call from Dr. Ranjani Raghunathan, who requested Plaintiff present to him. After Plaintiff performed his presentation, the chief residents suggested changes and indicated that there were

5

parts of the presentation that Dr. Potts would not like. Plaintiff experienced a severe panic attack and did not give his resident talk that day as scheduled. On April 13, 2006, Plaintiff emailed Dr. Potts, apologizing and seeking to reschedule the talk. Plaintiff was not allowed to present his talk.

On May 15, 2006, Plaintiff met with Dr. Potts. Dr. Potts gave Plaintiff a letter, stating that he was summarily discharged from the program. The letter stated that Plaintiff would not be allowed to complete the remainder of his PGY2-2 and that he would receive no credit for the year of training and would have to seek a third-year residency position in another training program. Dr. Potts also told Plaintiff that the primary reason for his dismissal was Plaintiff's alleged failure to take a Loyola review course for the Boards; however, Plaintiff asserts that he took the review course during his PGY2-1 and did not have to re-take that course during his PGY2-2, as agreed upon by Drs. Tran, Ragunathan, and Gilbert.

Dr. Potts also gave Plaintiff a letter dated from May 11, 2006, purportedly from Dr. McDonnell, which stated that Plaintiff's failure to give his resident talk was a violation of the requirements of the residency program. Dr. McDonnell's letter also indicated that the Review Board – consisting of Drs. McDonnell, Gilbert, and Subramanian – recommended that Plaintiff be summarily terminated from Mercy's residency program. In June 2006, Dr. Gilbert told Plaintiff that he had no knowledge of Dr. McDonnell's letter and that he had not recommended that Plaintiff be summarily discharged. In July 2006, Dr. Subramanian also stated that he was not aware of Dr. McDonnell's letter and had never recommended that Plaintiff be summarily discharged.

Plaintiff was permitted to continue his residency until June 30, 2006. On May 17, 2006, Plaintiff wrote a letter to Dr. Potts, indicating his intent to appeal the summary dismissal and

officially requesting that his resident talk be rescheduled. Plaintiff received no response to the letter. On May 29, 2006, Plaintiff again wrote another letter to Dr. Potts, appealing the decision. On June 9, 2006, Sister Sheila responded that a summary dismissal is final and carries no right to appeal and that the Handbook due process procedures do not apply to "actions taken in relation to a Resident's academic performance in the program." Sister Sheila's letter contained false information regarding Plaintiff's completion of his resident talk during his PGY2-1. On June 23, 2006, Plaintiff wrote to Sister Sheila and, upon hearing no response, sent another letter on July 12, 2006. Evaluations from Drs. Christou, Subramanian, Paes, and Hatipoglu were taken from his file. On July 25, 2006, Plaintiff received a letter form Sister Sheila, stating that she conducted an independent review and found that the summary dismissal was appropriate.

In October 2006, Plaintiff applied for a permanent medical license from IDFPR and sought information from Mercy. Mercy delayed in providing the necessary information, thereby delaying Plaintiff's application. Mercy also delayed providing requested information to residency programs that Plaintiff was seeking admittance. These delays have caused Plaintiff to miss opportunities in other residency programs.

## ANALYSIS

In ruling on a motion to dismiss, the court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff. *Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To meet Rule 8(a)(2)'s requirements, "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, ___U.S.___, ___, 127 S. Ct.

7

1955, 1964 (2007) (*Bell Atlantic*), quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (alteration in *Bell Atlantic*). "Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Serv., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007).

Plaintiff's claims for defamation, as alleged in Counts VIII and IX, and Plaintiff's claims for false light, as set forth in Counts X and XI, have a one-year statute of limitation following the time the cause of action accrued. 735 ILCS 5/13-201; *Schaffer v. Zekman*, 196 Ill. App. 3d 727, 734 n. 2 (1990). Both parties are in agreement that this Court cannot take into consideration any comments made prior to April 9, 2006, as Plaintiff filed his original Complaint on April 9, 2007.

*Counts VIII and IX*

Count VIII alleges that Mercy repeatedly defamed Plaintiff by making statements that caused harm to Plaintiff's reputation and "lowered him" in the eyes of the community. Count IX alleges that Dr. Potts made the above-referenced statements in his individual capacity. The Defendants contend: that Plaintiff has failed to identify specific factual allegations, as required under *Bell Atlantic*; that the alleged actionable comments are subject to innocent construction; and that the statements may be subject to qualified privilege.

"The gravamen of an action for defamation is the damage to plaintiff's reputation in the eyes of other persons." *Marczak v. Drexel Nat. Bank*, 186 Ill. App. 3d 640, 644 (1989), citing *Cowper v. Vannier*, 20 Ill. App. 2d 499, 503 (1959); *see also Kumaran v. Brotman*, 247 Ill. App. 3d 216, 225 (1993) (same). After April 9, 2006, Plaintiff was terminated from his PYG2-2 contract and received letters from the Review Board, Dr. Potts, and Sister Sheila that confirmed his termination. Plaintiff has not alleged that these letters were published or were directed to anyone outside the parties involved in this litigation. Besides a conclusory request for

reputational damages, Plaintiff has not alleged any basis above a speculative level to support his allegations of damage to his reputation in the eyes of the public. Accordingly, Counts VIII and IX are dismissed without prejudice.

*Counts X-XI*

Plaintiff alleges that Mercy's statement and actions (through Dr. Potts) and Dr. Potts, individually, placed Plaintiff in a false light before the public during PGY2-2.

In order to recover under such an action, a plaintiff must establish "(1) that a defendant gave publicity to a private fact, (2) that such a fact would be highly offensive to a reasonable person, and (3) that such a fact was not of legitimate public concern." *Poulos v. Lutheran Soc. Services of Illinois, Inc.*, 312 Ill. App.3d 731, 739-40 (2000), *citing Miller*, 202 Ill. App. 3d 976, 978-79 (1990). Plaintiff's Complaint is void of any allegations that reasonably suggest, beyond a speculative level, that the Defendants publicized a private fact. As such, Counts X and XI are dismissed without prejudice.

*Count XII*

Count XII alleges that Dr. Potts intentionally interfered with Plaintiff's PGY2-2 contract. The Defendants argue that Dr. Potts could not have interfered with the contract because Dr. Potts is a party to the contract. Plaintiff argues that he can maintain this claim because Dr. Potts was a third party to the contract, as he signed the contract in his representative capacity.

In order to state a cause of action for tortious interference with a contract, the plaintiff must allege: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified

inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages. *Kehoe v. Saltarelli*, 337 Ill. App. 3d 669, 676-77 (2003).

The contract at issue is the Residency Agreement, which is a contract between Mercy and Plaintiff. Dr. Potts, as Program Director of the Residency Program, signed the contract. The Defendants argue that this fact disposes of the claim. However, "where the agent's actions in interfering with the principal's contract are unjustified or malicious, such as where the agent's conduct is totally unrelated or antagonistic to the principal's interests," a claim for tortuous interference with a contract may exist. *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 1050-52 (1998), *citing HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 156-59 (1989).

In *Muthuswamy v. Burke*, 269 Ill. App. 3d 728, 733 (1993), the appellate court affirmed dismissal where the trial court had "found that defendant was acting within the scope of his authority as chairman of the department of medicine. . . . Under these circumstances, defendant possessed a limited privilege to interfere with the business or employment relationship of plaintiff." Likewise, in *Quist v. Board of Trustees of Community College Dist. No. 525*, 258 Ill. App. 3d 814, 821 (1994) (*Quist*), the court affirmed dismissal of the trial court's determination that an agent of the defendant Board of Trustees was not a third party and could not interfere with a contract. The court there held, pursuant to Illinois' fact-pleading requirements: "Inasmuch as plaintiff in this case charges that the president of defendant college made a statement allegedly threatening to her future employability, she is alleging interference by an agent of her employer, defendant college. Since, as aforesaid, the Board is the body politic

10

representing the college administration, plaintiff's complaint of tortious interference with contract charges interference by an agent of the Board, not by a third party to her contract with the Board." *Quist*, 258 Ill. App. 3d at 821.

In this case, Dr. Potts is the Director of the Residency Program; and, as the Complaint alleges, Dr. Potts was invested with certain powers in such a position, as evinced, in part, by the disciplinary actions taken by Dr. Potts in his representative capacity as Director. However, at this stage of the litigation, pursuant to federal pleading standards, it cannot be determined, factually, whether Dr. Potts' alleged conduct was totally unrelated or antagonistic to Mercy's interests or that he was acting as Mercy's agent when he engaged in the alleged conduct. Accordingly, dismissal of Count XII would be premature.

*Remaining Counts*

The Defendants argue that Plaintiff's tort and contract claims are barred by the following statutes: (1) the Illinois Hospital Licensing Act, 210 ILCS 85/10.2 ("IHLA"); (2) the Illinois Medical Practices Act, 225 ILCS 60/5 ("IMPA"); (3) the Illinois Medical Studies Act, 735 ILCS 5/8-2101 and 8-2102 ("IMSA"); and (4) the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.* ("HCQUIA"). In response, Plaintiff argues that he adequately pleads the willful and wanton exception to the IHLA, that Plaintiff's claims are not barred by the IHLA and IMPA because he seeks injunctive relief as well as monetary damages, that the IMSA is inapplicable at this phase of the litigation, and that the HCQUIA is not applicable.

11

The IHLA provides:

> [N]o hospital . . . shall be liable for civil damages as a result of the acts, omissions, decisions, or any other conduct, except those involving wilful and wanton misconduct, of . . . any . . . committee or individual whose purpose, directly or indirectly, is internal quality control . . ., or for the purpose of professional discipline .. .

210 ILCS 85/10.2.

"The legislative objective of section 10.2 is "to foster effective self-policing by members of the medical profession in matters unique to that profession and to thereby promote a legitimate State interest in improving the quality of health care in Illinois." *Szczerbaniuk v. Memorial Hosp. for McHenry County*, 180 Ill. App. 3d 706, 711 (1989), *quoting Knapp v. Palos Cmty. Hosp.*, 176 Ill. App. 3d 1012, 1024 (1988), *quoting Rodriquez-Erdman v. Ravenswood Hosp. Med. Ctr.*, 163 Ill. App. 3d 464, 470 (1987). The IHLA was amended in 1999 to include the exception for "willful and wanton misconduct."

The IHLA provides that a hospital will not be immune for civil liability if the misconduct of a committee or individual amounts to willful and wanton misconduct. Both parties agree that Plaintiff's claims hinge on whether or not Plaintiff has sufficiently pled allegations that could amount to willful and wanton misconduct. Section 10.2 defines "wilful and wanton misconduct" as "a course of action that shows actual or deliberate intention to harm or that, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety and the safety of others." 210 ILCS 85/10.2. This language is synonymous to Illinois Pattern Jury Instructions, which provides the following definition: "When I use the expression 'willful and wanton conduct' I mean a course of action which [shows actual or deliberate intention to harm] [or which, if not intentional,] [shows an utter indifference to or conscious disregard for (a person's

12

own safety)(and)(the safety of others) ]." Illinois Pattern Jury Instructions, Civil, No. 14.01 (2000). This instruction is utilized in cases regarding the Tort Immunity Act.

The Defendants support part of their argument based on Illinois case law that was decided before the amendment to the IHLA was passed in 1999. The only case in which the IHLA was discussed, as amended in 1999, was *Lo v. Provena Covenant Med. Ctr.*, 356 Ill. App. 3d 538, 544 (2005) (*Lo*). *Lo* recognized that Section 10.2's definition of "wilful and wanton misconduct" is not within the ordinary meaning of willful and wanton misconduct but, rather, a statutory definition. *Lo*, 356 Ill. App. 3d at 544. In *Lo*, the court granted the defendants' motion to dismiss plaintiff's breach of contract claims based on plaintiff's failure to allege misconduct that fits within the specialized definition of "wilful and wanton misconduct" in Section 10.2. *Lo*, 356 Ill. App. 3d at 545.

The court stated:

> If we were applying the ordinary definition of "willful and wanton misconduct" - i.e. great carelessness or gross negligence - it would be a question of fact whether the defendant's alleged conduct met the definition . . . . In this case, however, we are not dealing with the ordinary meaning of "willful and wanton misconduct" but with a statutory definition. . . . Plaintiff has alleged no facts, and has offered no evidence, from which we could reasonably infer that defendant "actual[ly] or deliberate[ly] inten[ded] to harm" him. See 210 ILCS 85/10.2 (West 2002). His own safety was never at issue in this case. See 210 ILCS 85/10.2 (West 2002).

*Lo*, 356 Ill. App. 3d at 544-45.

The Fourth District has essentially interpreted the definition of "wilful and wanton misconduct" to include such conduct that threatens the plaintiff's physical well being. However, some confusion still exists in the interpretation of the phrase "actual or deliberate indifference to

13

harm" in section 10.2. It is unclear if the Illinois Supreme Court would adopt such a rigid standard of the meaning of "willful and wanton misconduct" as statutorily defined in the IHLA. The Tort Immunity Act allows such damages that stem from injuries to reputation.

The Defendants also argue, however, that the IMPA bars Plaintiff's tort and contract claims. The IMPA provides:

> [W]hile serving upon any committee whose purpose, directly or indirectly, is internal quality control or . . . for the purpose of professional discipline, any person serving on such committee, and any person providing service to such committees, shall not be liable for civil damages as a result of their acts, omissions, decisions, or any other conduct in connection with their duties on such committees, except those involving wilful or wanton misconduct.

225 ILCS 60/5.

Again, the IMPA contains an exception for willful and wanton misconduct. The Defendants also seek immunity under the IMSA. The IMSA, Section 8-2101, provides:

> All information . . . used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services, except that in any health maintenance organization proceeding to decide upon a physician's services or any hospital or ambulatory surgical treatment center proceeding to decide upon a physician's staff privileges, or in any judicial review of either, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based.
>
> Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency, or person. The disclosure of any such information

14

> or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility.

735 ILCS 5/8-2102.

The provisions of the IMSA do not require dismissal as to any of the Counts contained within Plaintiff's Amended Complaint. Whether documents or other such items fall within this privilege "is a factual question" on which the Defendants here bear the burden of establishing. *Webb v. Mount Sinai Hospital & Med. Ctr. of Chicago, Inc.*, 347 Ill. App. 3d 817, 825 (2004), citing *Berry v. West Suburban Hosp. Med. Ctr.*, 338 Ill. App. 3d 49, 53-54 (2003).

The HCQUIA provides immunity for "professional review actions," *see* § 11111(a), that are taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures . . . or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a)(1-4).

Again, although the HCQUIA may provide immunity to the Defendants in this case, the allegations present factual issues regarding the requirements of the HCQUIA.

Accordingly, although the IHLA and IMPA may warrant immunity if the Defendants' conduct does not amount to "willful and wanton misconduct," at this stage of the litigation, Plaintiff has sufficiently pled allegations which could support a finding of willful and wanton misconduct as to withstand the Defendants' defenses based on the IHLA and IMPA.

Accordingly, in finding that these statutes do not provide immunity to the Defendants at this junction of the litigation, this Court must address the Defendants' additional arguments regarding dismissal of the remaining claims.

*Counts IV and V*

Count IV alleges that Mercy breached its PGY3 contract with Plaintiff by demoting and terminating him. Count V alleges that Mercy breached its PGY2-2 contract by dismissing him and denying his right to appeal his termination. The Defendants argue that these claims are not properly before the Court, as the decisions regarding termination of physician privileges are subject to limited judicial review for the sole purpose of determining whether the hospital complied with its bylaws. In response, Plaintiff argues, initially, that Mercy's bylaws were violated and also asserts that Illinois law permits judicial review where there is actual unfairness demonstrated on the record.

Illinois cases have repeatedly recognized that decisions of private hospitals respecting the termination, or curtailment of existing privileges of physicians on their medical staffs, are subject only to a limited judicial review. In such circumstances, the court will simply "determine whether the hospital complied with its bylaws in rendering the decision." *Goldberg v. Rush Univ. Med. Ctr.*, 317 Ill. App. 3d 597, 602 (2007). Courts are to exercise this limited review power as "[j]udicial tribunals are not equipped to review the action of hospital authorities in selecting or refusing to appoint members of medical staffs." *Knapp v. Palos Cmty. Hosp.*, 176 Ill. App. 3d 1012, 1020 (1988), *quoting Shulman v. Washington Hospital Center*, 222 F. Supp. 59, 64 (D.D.C. 1963). However, even limited review of this factual issue is now inappropriate; Defendants' motion to dismiss Counts IV and V is denied.

16

## Counts VI and VII

Next, Counts VI and VII, respectively, claim that Mercy's and Dr. Potts' treatment and conduct toward Plaintiff was extreme and outrageous as to constitute an intentional infliction of emotional distress. The Defendants argue, as an initial matter, that Plaintiff has not satisfied the pleading standard under *Bell Atlantic*, in that Plaintiff fails to identify specific factual allegations that form the basis of his claims. Second, the Defendants argue that the alleged conduct does not rise to the level of "extreme and outrageous" as a matter of law. Plaintiff argues that the conduct does in fact arise to such a level of "extreme and outrageous."

First, under the notice pleading standard, Plaintiff's Complaint is sufficient to place the Defendants on notice of the alleged operative facts given rise to Counts VI and VII. In order to prove intentional infliction of emotional distress in Illinois, a plaintiff must allege that (1) the conduct was truly extreme and outrageous; (2) the actor either intended that his conduct inflict severe emotional distress, or knew that there was a high probability that the conduct would cause severe emotional distress; and (3) the conduct, in fact, caused severe emotional distress. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269 (2003).

Whether conduct could be deemed "extreme and outrageous" is evaluated objectively based on all of the facts and circumstances. *McGrath v. Fahey*, 126 Ill. 2d 78, 90 (1988). The nature of a defendant's conduct must be "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 21 (1992), *quoting* Restatement (Second) of Torts § 46, Comment *d*, at 73 (1965). Plaintiff has sufficiently pled a claim of intentional infliction of emotional distress.

17

## CONCLUSION

For the above reasons, the Defendants' Motion to Dismiss as to Counts VIII - XI is granted. Counts VIII - XI are dismissed without prejudice with leave to refile, consistent with Federal Rule of Civil Procedure 11, within thirty days of this Order. As to Counts IV – VII and Count XII, the Defendants' Motion to Dismiss is denied.

Dated: November 17, 2007

JOHN W. DARRAH
United States District Court Judge